## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

WBY, INC. d/b/a FOLLIES,

    Plaintiff,

v.

CITY OF CHAMBLEE, GEORGIA,

    Defendant.

Civil Action No.
1:18-cv-05748-SDG

## OPINION AND ORDER

Plaintiff WBY, Inc. d/b/a Follies (hereafter, Follies) is a strip club located in Chamblee, Georgia. Follies's business model centers around offering fully nude dancing, selling alcohol to its patrons, and remaining open until the early hours of the morning. In 2018, Defendant City of Chamblee, Georgia (hereafter, Chamblee) enacted ordinances essentially prohibiting Follies from providing those services. In response, Follies initiated this lawsuit. After pursuing an unsuccessful motion for a preliminary injunction, Follies filed the operative Second Amended Complaint. Follies asserts a total of twelve claims against Chamblee. Only Counts I, III, V, VII, IX, and XI constitute substantive causes of action:

- Counts I and III allege violations of Follies's freedom of speech under the First and Fourteenth Amendments to the U.S. Constitution and related provisions of the Georgia Constitution;

- Counts V and VII allege the impermissible impairment of contract under the U.S. Constitution and Georgia Constitution;

- Count IX alleges violations of the First and Fourteenth Amendments to the U.S. Constitution relating to Chamblee's Alcohol Code; and

- Count XI alleges violations of the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution and corresponding provisions of the Georgia Constitution.[1]

Before the Court are cross-motions for summary judgment.[2] For the following reasons, Chamblee's motion for summary judgment [ECF 120] is **GRANTED** and Follies's motion for partial summary judgment [ECF 118] is **DENIED**. Follies has also filed an independent motion to strike [ECF 136], which is **DENIED**.[3]

---

[1]   Counts II, IV, VI, VIII, X, and XII seek various injunctive and monetary remedies for those substantive claims.

[2]   Follies seeks partial summary judgment as to Counts I, II, V, VI, IX, and X. Chamblee requests full summary judgment on all of Follies's claims.

[3]   Follies requests that the Court strike Chamblee's "reply" to its initial statement of material facts submitted in support of its motion for summary judgment. Follies is correct that none of the Federal Rules, Local Rules, or this Court's Standing Order expressly permit such a reply. However, Federal Rule of Civil Procedure 12(f) only grants the Court authority to strike pleadings. Fed. R. Civ. P. 12(f). A reply brief is not a pleading. Although Chamblee's "reply" is largely argumentative and not overly helpful in adjudicating the pending motions, the

## I.     BACKGROUND

Follies opened for business during 1992 in then-unincorporated DeKalb County, Georgia.[4] In June 2001, Follies—and other similar establishments—entered into a settlement agreement with DeKalb County that: (1) resolved pending litigation over DeKalb County's ordinances governing strip clubs and (2) granted Follies—upon payment of an annual fee—non-conforming status to offer fully nude dancing, sell alcohol, and remain open until 4:55 am (the DeKalb Agreement).[5] In November 2013, Chamblee incorporated as an independent city and annexed territory from DeKalb County, thereby subsuming Follies's physical location.[6] Although Chamblee quickly enacted a resolution rejecting the notion that incorporation bound it to the DeKalb Agreement, it nonetheless permitted Follies to continue its operations largely unabated.[7] Follies subsequently obtained an alcohol license from Chamblee for each of the years 2014 through 2018.[8]

---

Court ascertains no persuasive justification to entirely strike it. Therefore, Follies's motion is denied.

[4]     ECF 4-2, ¶ 9 (Youngelson Aff.); ECF 129, ¶ 1.

[5]     ECF 128-1, ¶¶ 6, 8. *See also* ECF 39-3 (DeKalb Agreement).

[6]     *Id.* ¶ 4.

[7]     *Id.* ¶ 7.

[8]     *Id.* ¶ 11.

Things changed in 2018. Chamblee decided to enact significant changes to its municipal codes. In February, Chamblee adopted Ordinance 745. That ordinance amended its Alcohol Code and required Follies to stop selling alcohol by 2:00 am (11:59 pm on Saturday nights) and close by 2:30 am.[9] Follies challenged the constitutionality of that ordinance in a separate litigation.[10]

Later that fall, Chamblee amended its regulations governing strip clubs and alcohol-serving establishments.[11] Ordinance 752 (colloquially referred to as the Adult Code) imposes three relevant restrictions. First, it prohibits any "patron, employee, or any other person" from "knowingly or intentionally, in an adult establishment, appear[ing] in a state of nudity."[12] Second, Ordinance 752 outlaws the sale, possession, use, or consumption of alcohol at a strip club.[13] Finally, Ordinance 752 requires such establishments to close at midnight.[14]

On the same day, Chamblee also adopted Ordinance 754. That ordinance amended a portion of Chamblee's Alcohol Code to render strip clubs categorically

---

[9]   *Id*. ¶ 20. *See also* ECF 117-2 (Ordinance 745).

[10]   *See* Civil Action No. 1:18-cv-02739 (N.D. Ga.).

[11]   ECF 10-2 (Ordinance 752); ECF 10-3 (Alcohol Code); ECF 39-2 (Ordinance 754).

[12]   ECF 10-2, § 22-115(a).

[13]   *Id*. § 22-115(d).

[14]   *Id*. § 22-118.

ineligible from applying for or obtaining an alcohol license.[15] That ordinance also altered the method for an establishment to qualify as a restaurant—and thereby gain eligibility to obtain an alcohol license—by requiring the applicant to "[d]erive at least 50 percent of total revenue from the sale of food prepared and consumed on the premises and nonalcoholic beverages consumed on the premises."[16]

Prior to passing Ordinance 752 and Ordinance 754, Chamblee prepared, received, and considered a voluminous evidentiary record.[17] That evidence detailed a plethora of negative secondary effects associated with strip clubs and other sexually oriented businesses, particularly those that sell and serve alcohol. For example, Chamblee relied on at least seventy-two relevant judicial decisions and thirty-eight evidentiary reports discussing societal concerns across the United States and in the local community.[18] Included amongst this evidence were: (1) a 2001 Fulton County study supporting the separation of adult and alcohol-serving

---

[15]   ECF 39-2, § 6-54(j).

[16]   *Id*. § 6-142 (hereafter, the Restaurant Qualifications). Before the passage of Ordinance 754, the prior version of Chamblee's Alcohol Code required an establishment to "[d]erive at least 50 percent of total sales from the sale of food and nonalcoholic beverages consumed on the premises, exclusive of sales from vending machines" to qualify as a restaurant [ECF 41-8, at 22 § 6-142(a)(5)].

[17]   ECF 128-1, ¶ 30. *See also* ECF 10-1; ECF 11; ECF 12; ECF 13; ECF 14.

[18]   ECF 128-1, ¶ 31.

establishments;[19] (2) investigator affidavits detailing various crimes, alcohol abuse, drug trafficking, and other events occurring in and around sexually oriented businesses in Forest Park and Sandy Springs, Georgia;[20] and (3) testimony from DeKalb County police officers concerning the prevalence of prostitution, drug sales, firearm possession, and other crimes at local strip clubs, specifically including Follies.[21] Chamblee cited many of these opinions and reports in the challenged ordinances themselves.[22]

According to Follies, the combination of these ordinances sounds the death knell for its business. If it cannot provide fully nude dancing, sell alcohol, and remain open after midnight—avers Follies—it will be forced to permanently cease operations. Follies maintains that Chamblee knows this to be true, as it enacted these ordinances—after tracking substantially similar litigation involving nearby newly-incorporated cities such as Sandy Springs, Brookhaven, and Doraville—to serve this exact purpose. Put another way, Follies alleges Chamblee disagrees with

---

[19]    ECF 11-14.

[20]    ECF 13-6.

[21]    ECF 13-7.

[22]    ECF 10-2; ECF 39-2.

the content of its expression and amended the municipal codes to drive Follies out
of business.

## II.  LEGAL STANDARD

Summary judgment is appropriate when "the movant shows that there is
no genuine dispute as to any material fact and the movant is entitled to judgment
as a matter of law." Fed. R. Civ. P. 56(a). The party seeking summary judgment
has the initial burden of informing the district court of the basis for its motion and
identifying those portions of the record that demonstrate the absence of a genuine
issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the movant
meets its burden, the non-movant must present evidence showing either
(1) a genuine issue of material fact or (2) that the movant is not entitled to
judgment as a matter of law. *Id.* at 324. The filing of cross-motions for summary
judgment does not alter this standard, "but simply requires a determination of
whether either of the parties deserves judgment as a matter of law on the facts that
are not disputed. *GEBAM, Inc. v. Inv. Realty Series I, LLC*, 15 F. Supp. 3d 1311, 1315–
16 (N.D. Ga. 2013) (citing *Am. Bankers Ins. Grp. v. United States*, 408 F.3d 1328, 1331
(11th Cir. 2005)). *See also United States v. Oakley*, 744 F.2d 1553, 1555–56 (11th Cir.
1984).

In analyzing a motion for summary judgment, the Court must "view all of the evidence in a light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor." *Newcomb v. Spring Creek Cooler Inc.*, 926 F.3d 709, 713 (11th Cir. 2019). But the non-movant cannot "rest upon the mere allegations or denials of [its] pleading, but must set forth specific facts showing that there is a genuine issue for trial." *Sears v. Roberts*, 922 F.3d 1199, 1207 (11th Cir. 2019). *See also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986). If the non-movant relies on evidence that is "merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986) (citations omitted). *See also Tesoriero v. Carnival Corp.*, 965 F.3d 1170, 1177 (11th Cir. 2020) ("Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial."). Further, the offering of "mere conclusions and unsupported factual allegations" is "legally insufficient to defeat a summary judgment motion." *Ellis v. England*, 432 F.3d 1321, 1326 (11th Cir. 2005).

## III.    DISCUSSION

Follies contends that Chamblee committed a number of constitutional violations. The Court addresses each general category of constitutional claim in turn.

### A.     Follies's Free Speech Claims

Follies alleges Ordinance 752 and Ordinance 754 violate its freedom of speech rights under the First Amendment and related provisions of the Georgia Constitution. States and municipal governments are prohibited from enacting laws that abridge the freedom of speech or expression. U.S. Const., amends. I, XIV. *See also Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015). The validity of a speech restriction "depends upon the type of speech and the type of forum being regulated." *Gold Coast Publ'ns, Inc. v. Corrigan*, 42 F.3d 1336, 1344 (11th Cir. 1994). A content-based regulation—which outlaws "particular speech because of the topic discussed or the idea or message expressed"—is "presumptively unconstitutional" and permissible "only if the government proves that [it is] narrowly tailored to serve compelling state interests." *Reed*, 576 U.S. at 163. *See also Wollschlaeger v. Governor, Fla.*, 848 F.3d 1293, 1308 (11th Cir. 2017) ("Content-based restrictions on speech normally trigger strict scrutiny.").

Nude dancing is a form of protected expressive conduct, albeit "fall[ing] only within the outer ambit of the First Amendment's protections." *City of Erie v. Pap's A.M.*, 529 U.S. 277, 289 (2000). *See also Maxim Cabaret, Inc. v. City of Sandy Springs*, 304 Ga. 187, 191 (2018) ("It is true that both the First Amendment and the free speech provision of the Georgia Constitution have been held to protect nude

dancing as a form of expressive conduct."). After adoption of Ordinance 752, Follies may no longer offer fully nude dancing. Neither can it sell or serve alcohol to its patrons. In fact, Ordinance 754 excludes Follies from applying for an alcohol license.

Although at first blush these ordinances "may appear to be content based because they target adult entertainment," it is axiomatic that "adult-entertainment ordinances are not treated like other content-based regulations." *Flanigan's Enters., Inc. of Ga. v. City of Sandy Springs*, 703 F. App'x 929, 933 (11th Cir. 2017) (*Flanigan's II*)[23] (citing *Peek-A-Boo Lounge of Bradenton, Inc. v. Manatee Cnty.*, 630 F.3d 1346, 1354 (11th Cir. 2011) (*Peek-A-Boo II*)). Laws enacted not on the basis of any content or message expressed, but to "combat the undesirable secondary effects of [sexually oriented] businesses are to be reviewed under the standards applicable to 'content-neutral' time, place, and manner regulations." *City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 49 (1986). Pursuant to this "secondary-effects" doctrine, such ordinances are subject to lesser, intermediate, scrutiny. *City of Los Angeles v. Alameda Books, Inc.*, 535 U.S. 425, 448 (2002) (Kennedy, J., concurring)

---

[23] The Eleventh Circuit has authored several opinions originating from the *Flanigan's* litigation. For purposes of this Order, the Court will refer to the published 2010 opinion as *Flanigan's I* and the unpublished 2017 opinion as *Flanigan's II*.

("A zoning restriction that is designed to decrease secondary effects and not speech should be subject to intermediate rather than strict scrutiny."); *Zibtluda, LLC v. Gwinnett Cnty. ex rel. Bd. of Comm'rs*, 411 F.3d 1278, 1284 (11th Cir. 2005) ("The Supreme Court has made clear that when the purpose of an adult entertainment ordinance is to ameliorate the secondary effects of adult businesses, intermediate scrutiny applies."). The Court must apply a three-part test to determine if the challenged ordinances are constitutional:

> [F]irst, the court must determine whether the ordinance constitutes an invalid total ban or merely a time, place, and manner regulation; second, if the ordinance is determined to be a time, place, and manner regulation, the court must decide whether the ordinance should be subject to strict or intermediate scrutiny; and third, if the ordinance is held to be subject to intermediate scrutiny, the court must determine whether it is designed to serve a substantial government interest and allows for reasonable alternative channels of communication.

*Peek-A-Boo Lounge of Bradenton, Inc. v. Manatee Cnty.*, 337 F.3d 1251, 1264 (11th Cir. 2003) (*Peek-A-Boo I*) (citing *Renton*, 457 U.S. at 46–50; *Alameda Books*, 535 U.S. at 433–45 (2002) (plurality opinion)).

The Eleventh Circuit and Georgia Supreme Court have repeatedly applied the secondary-effects doctrine to reject substantially similar challenges to municipal ordinances that prohibit conduct such as fully nude dancing, the sale of alcohol, or early-morning closing times. *See, e.g., Flanigan's II*, 703 F. App'x 929;

*Cornell Rest. Ventures, LLC v. City of Oakland Park*, 681 F. App'x 859 (11th Cir. 2017); *Peek-A-Boo II*, 630 F.3d 1346; *Curves, LLC v. Spalding Cnty.*, 685 F.3d 1284 (11th Cir. 2012); *Flanigan's Enters., Inc. of Georgia v. Fulton Cnty.*, 596 F.3d 1265 (11th Cir. 2010) (*Flanigan's I*); *Daytona Grand, Inc. v. City of Daytona Beach*, 490 F.3d 860 (11th Cir. 2007); *Peek-A-Boo I*, 337 F.3d 1251; *Maxim Cabaret*, 304 Ga. 187; *Oasis Goodtime Emporium I, Inc. v. City of Doraville*, 297 Ga. 513 (2015); *Trop, Inc. v. City of Brookhaven*, 296 Ga. 85 (2014*); Parker v. Whitfield Cnty.*, 265 Ga. 829 (1995); *Gravely v. Bacon*, 263 Ga. 203 (1993). Follies largely does not address these cases, nor much of the three-part test articulated in *Renton/Alameda Books*. Accordingly, the Court need not belabor its analysis under those factors.

First, the cumulative effect of Ordinance 752 and Ordinance 754 is not a total ban on protected, expressive conduct. Although Follies may no longer offer fully nude dancing, its dancers are free to continue engaging in semi-nude, erotic performances. The Eleventh Circuit has found similar prohibitions on full nudity in adult entertainment clubs constitutional within the *Renton* framework. *Fly Fish, Inc. v. City of Cocoa Beach*, 337 F.3d 1301, 1308 (11th Cir. 2003) ("If the message of nude dancing is eroticism, then Ordinance 1204 may properly be characterized as a *Renton*-type of time, place, or manner regulation. It does not ban erotic dancing, but rather totally nude dancing in an adult entertainment establishment.

Therefore, it merely regulates the manner of presentation of the erotic message. It does not ban the message; it only requires more clothing on the messenger."). *See also Erie*, 529 U.S. at 301 ("The requirement that dancers wear pasties and G-strings is a minimal restriction in furtherance of the asserted government interests, and the restriction leaves ample capacity to convey the dancer's erotic message."); *Barnes v. Glen Theatre, Inc.*, 501 U.S. 560, 571 (1991) ("[T]he requirement that the dancers don pasties and G-strings does not deprive the dance of whatever erotic message it conveys; it simply makes the message slightly less graphic."); *Daytona Grand*, 490 F.3d at 886 (finding the "requirement that dancers wear G-strings and pasties in all adult theaters" constitutional). The same is true for alcohol bans. *See Sammy's of Mobile, Ltd. v. City of Mobile*, 140 F.3d 993, 999 (11th Cir. 1998) ("[W]e are unaware of any constitutional right to drink while watching nude dancing."); *Oasis Goodtime Emporium I*, 297 Ga. at 525 ("Serving alcohol is not itself protected expression, and [the city's code] leaves Oasis's employees free to express themselves as they wish through dance or otherwise.").

Second, the Court must determine whether to apply strict or intermediate scrutiny. This decision is

> based on the government's interest in enacting the challenged ordinance. If the government sought to restrict the adult-entertainment-related speech because

of the speech's content, then the ordinance must be evaluated under strict scrutiny. But if the government intended to combat the "secondary effects" of adult entertainment in the surrounding community— *i.e.*, increased crime, decreased property values, *etc.*— then the ordinance is held to intermediate scrutiny. In other words, intermediate scrutiny applies if the ordinance can be justified without reference to the content of the regulated speech.

*Flanigan's II*, 703 F. App'x at 934 (citing *Renton*, 475 U.S. at 48; *Peek-A-Boo I*, 337 F.3d at 1264–65 & n.14). *See also Zibtluda*, 411 F.3d at 1285 (stating that, for "the second step of the *Renton* inquiry . . . the key question is whether the county has demonstrated that the purpose of the [ordinance] is to combat negative secondary effects of adult businesses").

The burden for "establishing this purpose is not high." *Zibtluda*, 411 F.3d at 1285. As explained by the Eleventh Circuit, the Supreme Court in *Renton* "looked no further than the ordinance itself, which recited as its purpose the protection and preservation of the quality of life in the city." *Id.* (citing *Renton*, 475 U.S. at 48). At a minimum, the municipality "must cite to *some* meaningful indication—in the language of the code or in the record of legislative proceedings—that the legislature's purpose in enacting the challenged statute was a concern over secondary effects rather than merely opposition to proscribed expression." *Id.* (quoting *Ranch House, Inc. v. Amerson*, 238 F.3d 1273, 1283 (11th Cir. 2001)).

*See also Maxim Cabaret*, 304 Ga. at 192 ("The express purpose of the challenged regulations is to combat the criminal activities and other undesirable secondary effects of the commercial combination of live nudity and alcohol. Thus, intermediate scrutiny applies.").

Intermediate scrutiny applies in this case. Chamblee's goal of counteracting and preventing the deleterious secondary effects associated with sexually oriented businesses—including criminal activity—is codified within the challenged ordinances themselves.[24] In other words, Chamblee provides ample justification on the face of the ordinances that does not target, and is unrelated to, the content of any speech or expression. And, as stated, Chamblee considered and relied on a vast trove of evidence detailing these negative secondary effects. In response, Follies contends Chamblee possessed an *illicit motive* in enacting the ordinances. The Court more thoroughly addresses this retort below. But at step two of the *Renton* framework, the Court finds Chamblee has met its burden.

Finally, the Court must apply the parameters of intermediate scrutiny: *i.e.*, determine whether the ordinances are "designed to serve a substantial government interest and allow[ ] for reasonable alternative channels of

---

[24]   ECF 10-2, at 1–6; ECF 39-2, at 6-9.

communication." *Peek-A-Boo I*, 337 F.3d at 1264. *See also Maxim Cabaret*, 304 Ga. at 192 (citing *Paramount Pictures Corp. v. Busbee*, 250 Ga. 252, 255-256 (1982)). "It has been by now clearly established that reducing the secondary effects associated with adult businesses is a substantial government interest 'that must be accorded high respect.'" *Daytona Grand*, 490 F.3d at 873–74 (quoting *Alameda Books*, 535 U.S. at 444 (Kennedy, J., concurring)). *See also Erie*, 529 U.S. at 296 ("The asserted interests of regulating conduct through a public nudity ban and of combating the harmful secondary effects associated with nude dancing are undeniably important."). The Eleventh Circuit has articulated the following burden-shifting framework:

> In determining whether the ordinance meets this standard [of intermediate scrutiny], the county or municipality first bears the initial burden of producing the evidence that it has relied on to reach the conclusion that the ordinance furthers its interest in reducing secondary effects. If the governmental entity has produced evidence that it reasonably believed to be relevant to its rationale for enacting the ordinance, then the burden shifts to the plaintiff to cast direct doubt on this rationale, either by showing that the evidence does not support its rationale or by producing evidence disputing the local government's factual findings. If the plaintiff sustains its burden, the burden shifts back to the government to supplement the record with evidence renewing support for a theory that justifies the ordinance.

*Peek-A-Boo II*, 630 F.3d at 1355 (citations and punctuation omitted).

A municipality is permitted to rely upon "whatever evidence . . . is reasonably believed to be relevant to the problem that the city addresses." *Renton*, 475 U.S. at 52. It is not required to "conduct local studies or produce evidence independent of that already generated by other municipalities to demonstrate the efficacy of its chosen remedy." *Peek-A-Boo I*, 337 F.3d at 1265 (citing *Erie*, 529 U.S. at 296; *Renton*, 475 U.S. at 51–52) (punctuation omitted). *See also Daytona Grand*, 490 F.3d at 875 ("Although a municipality must rely on at least some pre-enactment evidence, such evidence can consist of a municipality's own findings, evidence gathered by other localities, or evidence described in a judicial opinion."). At a minimum, the municipality's proffered evidentiary record "must fairly support its rationale." *Id.* (citing *Alameda Books*, 535 U.S. at 438 (plurality opinion), at 451–53 (Kennedy, J., concurring)).

Chamblee considered a voluminous evidentiary record detailing the negative secondary effects—including prostitution, violence, alcohol abuse, drug sales, and other crimes—associated with strip clubs that serve alcohol and maintain late-night closing times. The Eleventh Circuit has found substantially verbatim bodies of evidence sufficient to justify similar municipal ordinances in other recently incorporated Georgia cities. *Cornell*, 681 F. App'x at 865 ("[T]he record relied upon by the City—including judicial opinions and reports

and studies that had been prepared for other municipalities—is virtually the same legislative record that we found sufficient to meet the county's burden in support of the substantially similar regulations at issue in *Peek-A-Boo II*."). Follies raises no objection to the substance of Chamblee's proffered evidence. The Court finds Chamblee has articulated a substantial government interest and permits adequate alternative channels of communication, *i.e.*, semi-nude erotic dancing. Therefore, Chamblee's ordinances pass constitutional muster under *Renton/Alameda Books*.

Follies attempts to make three overarching legal distinctions to dispel the *Renton/Alameda Books* framework: that (1) strict scrutiny should apply because Chamblee possessed the illicit motive of specifically targeting and shutting down strip clubs; (2) strict scrutiny should apply under the Supreme Court's decision in *Reed*; and (3) even if intermediate scrutiny is applied, the ordinances are unconstitutional under the "proportionality test" articulated by Justice Kennedy's concurring opinion in *Alameda Books*. The Court addresses each argument in turn.

### i. Chamblee's Alleged Motive in Enacting the Ordinances Does Not Demand Application of Strict Scrutiny.

Follies argues the secondary-effects test is inapplicable—and the Court should instead apply strict scrutiny—because Chamblee's true motive and desire in acting the ordinance was not community well-being, but to target and shut

down strip clubs because of the content of their expression. An aggrieved party may challenge an ordinance that relies upon the secondary-effects rationale "either by demonstrating that the municipality's evidence does not support its rationale, or by furnishing evidence that disputes the municipality's factual findings." *Peek-A-Boo I*, 337 F.3d at 1265 (citing *Alameda Books*, 535 U.S. at 439 (plurality opinion)). Follies pursues neither option; it does not dispute any of Chamblee's evidence or present its own contradicting Chamblee's findings. Instead, it alleges Chamblee modeled its ordinances after similar laws passed, and successfully defended, by neighboring cities. According to Follies, Chamblee tracked the litigation between those cities and other strip clubs to ensure its own ordinances would ultimately eliminate Follies's business model. This is evident, avers Follies, because Chamblee's current legal counsel represented many of those cities in their respective litigations.

Follies argument falls short of demonstrating that Chamblee acted with the intent to suppress speech. At best, Follies's evidence shows that various Chamblee officials were aware of pending litigation and, after each city prevailed, strip clubs subsequently closed. Follies does not show, however, that those officials specifically enacted these ordinances to shut Follies down. Follies relies solely on speculation, which is not sufficient. *See Renton*, 475 U.S. at 48 ("It is a familiar

principle of constitutional law that this Court will not strike down an otherwise constitutional statute on the basis of an alleged illicit legislative motive.") (quoting *United States v. O'Brien*, 391 U.S. 367, 383 (1968)). Even assuming Follies's allegations to be true, Chamblee may rely on its neighboring cities' successful defenses of substantially similar ordinances. Indeed, doing so *strengthens* its justification under the secondary-effects doctrine. *See Peek-A-Book I*, 337 F.3d at 1268 ("To satisfy *Renton* . . . evidence described in a judicial opinion [ ] may form an adequate predicate to the adoption of a secondary effects ordinance."). *See also Zibtluda*, 411 F.3d at 1286 (stating that municipality may rely on "the experience of other cities, studies done in other cities, caselaw reciting findings on the issue, as well as the officials' own wisdom and common sense"). Follies's argument "is entirely circumstantial, inferential, and remote" — *Zibtluda*, 411 F.3d at 1288 — and must be rejected.

### ii.    The Supreme Court's Decision in *Reed v. Town of Gilbert* Is Not Applicable.

Follies also argues the Supreme Court's decision in *Reed* compels the application of strict scrutiny. In *Reed*, the Supreme Court found that a municipality's sign code constituted a content-based speech restriction because it treated categories of signs differently based on the type of information conveyed. 576 U.S. at 159, 163–65. Relevant here, the Court held that "[a] law that is content

based on its face is subject to strict scrutiny regardless of the government's benign motive, content-neutral justification, or lack of animus toward the ideas contained in the regulated speech." *Id.* at 165 (punctuation omitted). *See also id.* at 166 ("In other words, an innocuous justification cannot transform a facially content-based law into one that is content neutral."). The Court ultimately found the sign code unconstitutional, as the municipality could not satisfy the high burden of strict scrutiny. *Id.* at 171–73.

Relying on *Reed*, Follies argues Ordinance 752 and Ordinance 754 are facially content-based because they target strip clubs and adult-oriented businesses. So, avers Follies, strict scrutiny should apply irrespective of whatever purported negative secondary effects Chamblee seeks to ameliorate as a proffered justification. But as Follies concedes, this exact argument has been squarely considered and rejected by the Eleventh Circuit.

In *Flanigan's II*, the Eleventh Circuit acknowledged that "[t]here is no question that *Reed* has called into question the reasoning undergirding the secondary-effects doctrine." 703 F. App'x at 935.[25] Nonetheless, the panel declined to interpret *Reed* as a complete overhaul because "the majority opinion in *Reed* did

---

[25]   In the Eleventh Circuit, unpublished decisions are not binding precedent, but may be cited as persuasive authority. Fed. R. App. P. 32.1; 11th Cir. R. 36–2.

not address the secondary-effects doctrine" and, for that reason alone, the opinion could not be read "as abrogating either the Supreme Court's or this Circuit's secondary-effects precedents." *Id*. Because binding "secondary-effects precedents [were] on all fours with the adult-entertainment regulations" at issue in *Flannigan's II*, the Eleventh Circuit elected to "follow the . . . doctrine because it has direct application in this case, notwithstanding that it may appear to rest on reasons rejected in *Reed*." *Id*. (citing *Rodriguez de Quijas v. Shearson/Am. Exp., Inc.*, 490 U.S. 477, 484 (1989)). *See also Maxim Cabaret*, 304 Ga. at 192 n.4 ("*Reed* did not involve secondary-effects legislation. Nor did the opinion in *Reed* mention, much less overrule, prior cases in which the Supreme Court held that regulations designed to reduce the negative secondary effects of adult entertainment businesses are treated as content neutral and thus subject to an intermediate level of scrutiny.").

The Court's holding in *Flannigan's II* is in accord with decisions from two other federal appellate courts. *See Free Speech Coal., Inc. v. U.S. Att'y Gen.*, 825 F.3d 149, 161 (3d Cir. 2016) ("Although we do not reach the issue, we agree with the dissent that it is doubtful that *Reed* has overturned the *Renton* secondary effects doctrine."); *BBL, Inc. v. City of Angola*, 809 F.3d 317, 326 n.1 (7th Cir. 2015) ("We don't think *Reed* upends established doctrine for evaluating regulation of

businesses that offer sexually explicit entertainment, a category the Court has said occupies the outer fringes of First Amendment protection.").

Follies ostensibly argues that the *Flanigan's II* and *Maxim Cabernet* courts got it wrong. Indeed, Follies confirms that it has advanced this argument simply "to preserve the issue for further review."[26] Its preservation is noted, but this Court finds Follies's argument to be unavailing.

### *iii.* The Proportionality Test Is Not Applicable.

Follies's final argument is that, even if the Court applies intermediate scrutiny, the ordinances should still be struck down because of the disproportionate effect they have on its economic and commercial viability. In *Alameda Books*, a plurality of the Supreme Court reaffirmed the three-part *Renton* secondary-effects test and upheld a municipal ordinance dictating where sexually orientated businesses could operate. 535 U.S. at 431–43 (plurality opinion). Justice Kennedy penned a concurring opinion—not joined by any other Justice— expressing his overarching belief that "a city may not regulate the secondary effects of speech by suppressing the speech itself." *Id.* at 445 (Kennedy, J., concurring).

---

[26] ECF 118-1, at 37.

Justice Kennedy took issue with two specific aspects of the plurality's opinion. First, he expressed his disagreement with the "content neutral" classification underlying the secondary effects doctrine. *Id.* at 444–45. According to Justice Kennedy, this is "something of a fiction" because "whether a statute is content neutral or content based is something that can be determined on the face of it; if the statute describes speech by content then it is content based." *Id.* at 448 ("These ordinances are content based, and we should call them so."). *See also Zibtluda*, 411 F.3d at 1285 ("[A]lthough these ordinances are not strictly content-neutral, they are simply treated as such.").

Second, Justice Kennedy characterized the plurality opinion as "a subtle expansion" of *Renton*. *Id.* at 444–45 (Kennedy, J., concurring). In his view, a municipality "must advance some basis to show that its regulation has the purpose and effect of suppressing secondary effects, *while leaving the quantity and accessibility of speech substantially intact*." *Id.* at 449 (emphasis added). Put another way, Justice Kennedy explained that "[i]t is no trick to reduce secondary effects by reducing speech or its audience; but a city may not attack secondary effects indirectly by attacking speech." *Id.* at 450. *See also id.* at 451 ("It is true that cutting adult speech in half would probably reduce secondary effects proportionately. But again, a promised proportional reduction does not suffice."). The Eleventh Circuit

has since referred to Justice Kennedy's concurrence as the "proportionality test." *Flanigan's II*, 703 F. App'x at 936–37.

Relying on the proportionality test, Follies argues the challenged ordinances are impermissible because their cumulative effect renders its business economically unfeasible. According to Follies, it will be forced to permanently close if the ordinances remain in place. And if that happens, the result will be the suppression of protected speech—*i.e.*, nude or erotic dancing—in the marketplace.

Like Follies's argument regarding the effect of *Reed*, its reliance on Justice Kennedy's proportionality test runs headlong into a threshold obstacle: it too has been considered and rejected by the Eleventh Circuit.[27] In *Flanigan's II*, the Eleventh Circuit declined to adopt the proportionality test as the law of the Circuit. 703 F. App'x at 937. Recalling *Reed*, the Eleventh Circuit found persuasive that the opinion "has called into question the fundamental underpinnings of the secondary-effects doctrine, even suggesting that the doctrine may be abrogated," which "counsels against extending the doctrine based on the opinion of one

---

[27] Follies's reliance on the purported economic consequences of the ordinances is also contrary to binding law. *Renton*, 475 U.S. at 54 ("The inquiry for First Amendment purposes is not concerned with economic impact.") (quoting *Young v. Am. Mini Theatres, Inc.*, 427 U.S. 50, 78 (1976) (Powell, J., concurring)). *See also Int'l Food & Beverage Sys. v. City of Fort Lauderdale*, 794 F.2d 1520, 1526 (11th Cir. 1986) ("[T]he first amendment does not guarantee anyone a profit.").

Supreme Court Justice in one of his concurrences, which was based on a fact pattern not present in this case." *Id. See also id.* ("The question of whether to apply the proportionality test would be a difficult one even if we were faced with the same type of ordinance as that at issue in *Alameda Books*. But today we encounter a variety of different ordinances, and we do so in a post-*Reed* jurisprudential landscape."). Crucially, the Court here faces substantially similar ordinances as addressed in *Flanigan's II*. Thus, that decision is both factually and legally on point.[28] The Court will follow it here.[29]

In sum, applying intermediate scrutiny under the secondary-effects doctrine, the Court finds Ordinance 752 and Ordinance 754 are permissible

---

[28] The Sixth Circuit has also expressly rejected Follies's argument. *Ent. Prods., Inc. v. Shelby Cnty.*, 721 F.3d 729, 741–42 (6th Cir. 2013).

[29] The Court agrees that it is somewhat challenging to square *Flannigan's II's* holding that "Justice Kennedy's *Alameda Books* proportionality test . . . is not binding Supreme Court precedent" with the bevy of other published Eleventh Circuit opinions—both pre-and-post *Flanigan's II*—that say the exact opposite. *See Stardust, 3007 LLC v. City of Brookhaven*, 899 F.3d 1164, 1176 (11th Cir. 2018) ("There was no majority opinion in *Alameda Books*, but because Justice Kennedy's concurrence reached the judgment on the narrowest grounds, his opinion represents the Supreme Court's holding in that case.") (quoting *Peek-A-Boo II*, 630 F.3d at 1354 n.7); *Daytona Grand*, 490 F.3d 860, 875 n.20 (11th Cir. 2007) ("Because Justice Kennedy concurred in the judgment in *Alameda Books* on the narrowest grounds, his opinion represents the Supreme Court's holding in that case."). But the *Flanigan's II* court distinguished those cases on the facts, and the Court will not second guess its reasoning.

regulations. Chamblee is therefore entitled to summary judgment on Follies's free speech claims.

## B. Follies's Impairment of Contract Claims

Follies alleges Ordinance 752 and Ordinance 754 substantially impair the agreement it executed with DeKalb County prior to the land annexation by Chamblee. The Contract Clause of the U.S. Constitution provides that "[n]o State shall . . . pass any . . . [l]aw impairing the [o]bligation of [c]ontracts." U.S. Const. Art. I, Sec. X. Although broad in language, it is "commonplace that the Contract Clause does not operate to obliterate the police power of the States"; rather, it "must be understood to impose *some* limits upon the power of a State to abridge existing contractual relationships, even in the exercise of its otherwise legitimate police power." *Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234, 241–42 (1978) (emphasis in original). Put another way, "[t]he Contract Clause protects contracting parties' reasonable contractual expectations against unreasonable abrogation by the states." *S&M Brands, Inc. v. Georgia ex rel. Carr*, 925 F.3d 1198, 1202–03 (11th Cir. 2019). As summarized by the Supreme Court:

> The threshold issue is whether the state law has operated as a substantial impairment of a contractual relationship. In answering that question, the Court has considered the extent to which the law undermines the contractual bargain, interferes with a party's reasonable expectations, and prevents the party from safeguarding

or reinstating his rights. If such factors show a substantial impairment, the inquiry turns to the means and ends of the legislation. In particular, the Court has asked whether the state law is drawn in an appropriate and reasonable way to advance a significant and legitimate public purpose.

*Sveen v. Melin*, 138 S. Ct. 1815, 1821–22 (2018). *See also Gen. Motors Corp. v. Romein*, 503 U.S. 181, 186 (1992) ("[W]hether the change in state law has operated as a substantial impairment of a contractual relationship. . . . has three components: whether there is a contractual relationship, whether a change in law impairs that contractual relationship, and whether the impairment is substantial.").

The Georgia Constitution similarly states that "[n]o . . . laws impairing the obligation of contract . . . shall be passed." Ga. Const. Art. I, Sec. 1, Par. X. Practically speaking, both clauses operate in the same manner. *All Star, Inc. v. Ga. Atlanta Amusements, LLC,* 332 Ga. App. 1, 8 (2015) ("[T]he contract clauses of both the Georgia and the United States Constitutions forbid the legislature from enacting any law impairing the obligation of contracts.") (punctuation omitted). To establish a violation, the complaining party must "show that a vested right is at stake." *Polo Golf & Country Club Homeowners Ass'n, Inc. v. Cunard*, 306 Ga. 788, 793 (2019). Georgia courts consider "whether a vested right exists and then whether that vested right has been injuriously affected by the law in question." *Id.* (punctuation omitted).

Chamblee contends Follies's claims fail because Follies cannot identify a valid contract between the parties. The Court agrees. Follies points only to the DeKalb Agreement. It granted Follies non-conforming status to operate in derogation of DeKalb County's laws for a period of fifteen years, effective January 1, 2007.[30] In exchange, Follies agreed to pay DeKalb County an annual fee of: (1) $100,000 for the first ten years and (2) $150,000 for the subsequent five years.[31] By its own terms, the DeKalb Agreement was set to automatically terminate on December 31, 2021.[32] It also stated:

> This agreement shall be binding upon DeKalb County, its successors, transferees, [and] assigns for the terms specified herein. This agreement shall be binding upon any governmental body to which the County transfers regulatory control over the matters herein, expressly including any municipality which obtains jurisdiction by incorporation or annexation.[33]

But Chamblee was not a party to the DeKalb Agreement. To the contrary, Chamblee enacted a resolution expressly rejecting the position that incorporation bound it to the terms of the DeKalb Agreement.[34] Follies's attempt to hold

---

[30]   ECF 39-3, at 5–6.

[31]   *Id*. at 10.

[32]   *Id*. at 6.

[33]   *Id*. at 6.

[34]   ECF 35-1, at 4.

Chamblee — an independent municipality — accountable for DeKalb County's promises is squarely foreclosed by Georgia law. O.C.G.A. § 36-30-3(a) ("One council may not, by an ordinance, bind itself or its successors so as to prevent free legislation in matters of municipal government."). To be sure, the Georgia Supreme Court — in a substantially similar action brought by another strip club (the Pink Pony) against a newly-incorporated city in DeKalb County (Brookhaven) — expressly found that the DeKalb Agreement "cannot be used to bind the successively incorporated City of Brookhaven." *Trop, Inc. v. City of Brookhaven*, 296 Ga. 85, 88 (2014). *See Oasis Goodtime Emporium I*, 297 Ga. at 515 n.5 (discussing the same issue regarding Doraville, Georgia). This, according to the Georgia Supreme Court, "undermine[d] Pink Pony's erroneous arguments that it had some vested right to continue operation as a nude dancing club that serves alcohol." *Trop.*, 296 Ga. at 88.

The same holds true here. Follies cannot transmute the DeKalb Agreement into a contractual promise with Chamblee to operate in derogation of Chamblee's laws. *See DeKalb Cnty. v. Ga. Paperstock Co.*, 226 Ga. 369, 371–72 (1970) (holding agreement between current county commissions and the defendant "would not be binding on any subsequent board of county commissioners, and, therefore, would not be enforceable beyond the year in which it was made without the continued

approval of such board of commissioners").[35] *See also Brown v. City of E. Point*, 246 Ga. 144, 145 (1980) ("Cases decided during the past decade indicate that a council may bind itself although it may not bind its successors."). Follies's response is that O.C.G.A. § 36-30-3(a), *Trop*, and *Georgia Paperstock* only address the validity of the DeKalb County agreement under Georgia law and do not foreclose its constitutional claim. But Follies's argument misconstrues the foundation of its cause of action. Without a valid contractual relationship with Chamblee, it has no claim for the impairment of contract. *Romein*, 503 U.S. at 189 (holding the Contract Clause applies to state actions which "impair the obligation of pre-existing contracts"). As such, Chamblee is entitled to summary judgment on Follies's Contract Clause claims.

### C.  Follies's First and Fourteenth Amendment Challenges to Ordinance 754.

Follies alleges Ordinance 754's requirements for an establishment to qualify as a restaurant permitted to obtain an alcohol license are unconstitutionally vague.

---

[35]  It is undisputed that, from 2014 through 2018, Chamblee continued to permit Follies to operate and received certain payments in return. But it is likewise uncontested that Chamblee directed that the payments cease in 2018 prior to enactment of the at-issue ordinances. Follies does not advance a ratification theory. Thus, the Court does not find these actions sufficient to constitute an ongoing contract for purposes of the contract clauses.

A vague law may violate fundamental principles of due process. *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972). A law is impermissibly vague if it: (1) "fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits" or (2) "authorizes or even encourages arbitrary and discriminatory enforcement." *Hill v. Colorado*, 530 U.S. 703, 732 (2000).

It is well established that "[t]he degree or vagueness that the Constitution tolerates"—and accompanying level of judicial scrutiny—"depends in part on the nature of the enactment." *Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 498 (1982). When a regulation does not "threaten[ ] to inhibit the exercise of constitutionally protected rights," it is valid unless "the enactment is impermissibly vague in all of its applications." *Id.* at 498–99 (citations omitted). *See also Seventh St., LLC v. Baldwin Cnty. Plan. & Zoning Comm'n*, 172 F. App'x 918, 922 (11th Cir. 2006). Further, an "economic regulation is subject to a less strict vagueness test," and the Supreme Court has "expressed greater tolerance of enactments with civil rather than criminal penalties because the consequences of imprecision are qualitatively less severe." *Hoffman Estates*, 455 U.S. at 489–99.

Prior to 2018, Section 6-142(a) of Chamblee's Alcohol Code contained specific requirements for an establishment to qualify as a restaurant.[36] Ordinance 754 amended that section to provide:

(a)　　To be eligible for, and to operate under, a consumption on the premises license as a restaurant, an establishment must:

\*　　　\*　　　\*　　　\*

(5)　　Derive at least 50 percent of total revenue from the sale of food prepared and consumed on the premises and nonalcoholic beverages consumed on the premises. For purposes of this subsection, if an establishment requires customers to pay a minimum charge to enter or remain on the premises, the amount so charged shall not be counted toward the 50 percent requirement.[37]

Section 6-142, as amended, is entitled to a high degree of judicial deference. The ordinance: (1) is an economic regulation; (2) provides for civil, not criminal, penalties; and (3) merely articulates content-neutral qualifications for an establishment to qualify as a restaurant without infringing upon—or even relating to—any constitutionally protected right. Follies does not challenge these facts. Neither does Follies purport to show that § 6-142 is impermissibly vague in all of its applications.

---

[36]　ECF 41-8, at 22 § 6-142(a)(5).

[37]　ECF 39-2, at 16 § 6-142(a).

For the first time in its response in opposition to Chamblee's motion for summary judgment, Follies recharacterizes its cause of action as an "as applied" challenge. Although not as robustly developed in the relevant case law, an "as applied" challenge "addresses whether a statute is unconstitutional on the facts of a particular case or to a particular party." *Harris v. Mexican Specialty Foods, Inc.*, 564 F.3d 1301, 1308 (11th Cir. 2009). Follies's shift in strategy does not save its claim. Irrespective of the label, the law is clear: "To find a civil statute void for vagueness, the statute must be so vague and indefinite as really to be no rule or standard at all." *Seniors C.L. Ass'n, Inc. v. Kemp*, 965 F.2d 1030, 1036 (11th Cir. 1992) (quoting *Boutilier v. Immigr. & Naturalization Serv.*, 387 U.S. 118, 123 (1967)). *See also Leib v. Hillsborough Cnty. Pub. Transp. Comm'n*, 558 F.3d 1301, 1311 (11th Cir. 2009) ("[T]he Constitution does not require precision; all that is required is that the language conveys sufficiently definite warning as to the proscribed conduct when measured by common understanding.").

That is not the case here. Ordinance 754 unambiguously articulates what an establishment must do to qualify as a restaurant. The requirement's language is sufficiently plain as to allow "persons of reasonable intelligence [to] derive a core meaning" from it. *Seniors C.L. Ass'n*, 965 F.2d at 1036 (citing *Cotton States Mut. Ins. Co. v. Anderson*, 749 F.2d 663, 669 n.9 (11th Cir. 1984)). That Follies disagrees with

the substance of this clear guideline—and would rather continue its prior practice of offering only prepackaged food or a free buffet—does not render the code unconstitutionally vague. Therefore, Chamblee is entitled to summary judgment on Follies's void-for-vagueness challenge.

### D.     Follies's Equal Protection Claims

Follies alleges Chamblee violated its equal protection rights under the U.S. Constitution—as well as the corresponding provisions of the Georgia Constitution—through its adoption and enforcement of Ordinance 754.[38] In relevant part, the Fourteenth Amendment provides that "[n]o State shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV. As a general principle, the "purpose of the equal protection clause . . . is to secure every person within the state's jurisdiction against intentional and arbitrary discrimination, whether occasioned by express

---

[38]  The federal and state claims are governed by the same standards. *See Williams v. Fulton Cnty. Sch. Dist.*, 181 F. Supp. 3d 1089, 1136 (N.D. Ga. 2016) ("The Equal Protection Clause of the Georgia Constitution is coterminous with that of the federal constitution, and so the same analysis applies to Plaintiffs' state and federal equal protection claims."); *Pitts v. Georgia*, 293 Ga. 511, 515–16 (2013) ("[T]he protection provided in the Equal Protection Clause of the Federal Constitution is coextensive with that provided in the Georgia Constitution.").

terms of a statute or by its improper execution through duly constituted agents."

*Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000).

### 1. Follies Presents No Evidence that Chamblee Adopted Ordinance 754 Based on a Discriminatory Intent or Purpose.

Follies alleges Chamblee's policymakers "harbor[ed] an invidious discriminatory purpose" based on the "racial and ethnic composition" of Follies's clientele, which constituted a "substantial motivating factor" for adopting the restaurant qualification requirements found in § 6-142(a)(5) of Ordinance 754. "[P]roof of racially discriminatory intent or purpose is required to show a violation of the Equal Protection Clause." *City of Cuyahoga Falls v. Buckeye Cmty. Hope Found.*, 538 U.S. 188, 194 (2003) (citing *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 264 (1977)). A law that is facially neutral "violates the Equal Protection Clause if adopted with the intent to discriminate against a racial group." *Johnson v. Governor of Fla.*, 405 F.3d 1214, 1222 (11th Cir. 2005) (citing *Washington v. Davis*, 426 U.S. 229, 239 (1976)). Such a facially neutral regulation is unconstitutional only if:

> (1) discrimination was a substantial or motivating factor in the government's enactment of the law, and (2) the government cannot rebut that claim by showing that the provision would have been enacted in the absence of any racially discriminatory motive.

*Young Apartments, Inc. v. Town of Jupiter,* 529 F.3d 1027, 1044–45 (11th Cir. 2008) (citing *Johnson*, 405 F.3d at 239) (punctuation omitted).

The Eleventh Circuit has provided clear guidance for the Court to follow at step one:

> Determining whether invidious discriminatory purpose was a motivating factor in adopting a statute or ordinance demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available. The impact of the official action—that is, whether it bears more heavily on one race than another—may provide an important starting point. However, unless there is a clear pattern that the action is impacting one race more than another, impact alone is not determinative, and courts must look to other evidence such as the historical background behind the state's action and the specific sequence of events in the state's decision-making process.

*Young*, 529 F.3d at 1045 (citing *Arlington Heights*, 429 U.S. at 266).

Follies has not met its burden here. At the outset, Follies is not a minority-owned business.[39] It has also presented no evidence demonstrating the race of its clientele. More problematic, it offers no evidence that discrimination played any role in the enactment of Ordinance 754. That ordinance is facially neutral. The challenged portion simply establishes baseline requirements for an

---

[39]    Both of Follies's co-owners are Caucasian [ECF 109 (Shine Dep. Tr. 11:23 12:4)].

establishment to qualify as a restaurant. In fact, a substantially similar requirement pre-dated the passage of Ordinance 754.[40] The primary difference between the original and amended versions is that Ordinance 754 only permits an establishment to count "the sale of food *prepared* and consumed on the premises" towards the 50 percent threshold.[41]

This new requirement prevents Follies from engaging in its prior practice of pairing a package of crackers—or other prepackaged food—with an alcoholic drink under one single transaction as to increase its food sales numbers and satisfy the 50-percent requirement. Without regard to the legitimacy of this practice, there is no evidence Chamblee acted with a discriminatory motive in adding this extra requirement. Even assuming, *arguendo*, that Ordinance 754 has adversely impacted Follies's chosen strategy to obtain an alcohol license, that alone is not enough to prevail. *See E & T Realty v. Strickland*, 830 F.2d 1107, 1114 (11th Cir. 1987)

---

[40]   ECF 41-8, at 22 § 6-142(a)(5).

[41]   ECF 39-2, at 16 § 6-142(a)(5). Follies also challenges Ordinance 754's prohibition on establishments counting a "cover charge" for patrons to enter the premises towards the 50 percent total revenue threshold. But the prior version of this ordinance also contained such a limitation: "[I]f a restaurant makes a minimum charge or cover charge, the amount so charged shall not be counted in computing total sales and shall not be counted as a food or beverage sale." [ECF 41-8, at 22 § 6-142(a)(5)]. This undercuts any assertion that the "cover charge" provision of Ordinance 754 was enacted with a discriminatory purpose.

("Discriminatory purpose implies more than intent as volition or intent as awareness of consequences. It implies that the decisionmaker selected a particular course of action at least in part because of its adverse effects upon an identifiable group.") (punctuation omitted). Chamblee is thus entitled to summary judgment on this aspect of Follies's equal protection claim.

### 2. Follies Fails on Its Selective Enforcement Claim.

Follies alleges Chamblee has also selectively enforced the restaurant qualification requirements of Ordinance 754. "It is well settled that unequal application of a facially neutral statute may violate the Equal Protection Clause." *Strickland v. Alderman*, 74 F.3d 260, 264 (11th Cir. 1996) (collecting cases). *See also E & T Realty*, 830 F.2d at 1113 ("Unequal administration of facially neutral legislation can result from either misapplication (*i.e.*, departure from or distortion of the law) or selective enforcement (*i.e.*, correct enforcement in only a fraction of cases)."). To succeed on such a claim, the plaintiff must show that: "(1) the plaintiff was treated differently than similarly situated persons; and (2) the defendant unequally applied the facially neutral statute for the purpose of discriminating against the plaintiff." *Strickland*, 74 F.3d at 264 (citing *E & T Realty*, 830 F.2d at 1109–10).

Despite significant briefing, Follies does not clearly articulate whether its selective enforcement claim is premised on alleged racial discrimination or a "class-of-one" theory.[42] But the distinction is irrelevant here; both tests require the plaintiff to sufficiently demonstrate a similarly situated comparator.[43] *Campbell*, 434 F.3d at 1313. *See also Young*, 529 F.3d at 1045 (11th Cir. 2008) ("[T]he same strict similarly situated standard applies whether an equal protection claim is brought under a class of one theory or a traditional theory of unlawful discrimination." (quoting *Griffin Indus. v. Irvin*, 496 F.3d 1189, 1204–05 (11th Cir. 2007)). To satisfy this burden, "the comparators must be *prima facie* identical in all relevant respects." *Grider v. City of Auburn*, 618 F.3d 1240, 1264 (11th Cir. 2010) (punctuation omitted). *See also E & T Realty*, 830 F.2d at 1109 ("Different treatment of dissimilarly situated persons does not violate the equal protection clause.").

---

[42] Selective enforcement claims are not "limited to individuals discriminated against based on their membership in a vulnerable class," as government entities are required "to treat similarly situated people alike." *Campbell v. Rainbow City*, 434 F.3d 1306, 1313 (11th Cir. 2006). In these so called "class-of-one" cases, the plaintiff must establish that it "has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." *Vill. of Willowbrook*, 528 U.S. at 564 (collecting cases).

[43] The tests diverge at the second step: *i.e.*, whether strict or rational basis scrutiny is applied. *See Young*, 529 F.3d at 1046 n.8. Because Follies has not met its burden at step one, the Court need not reach step two.

Since March 2019, Chamblee has denied Follies's applications for an alcohol license.[44] One of Chamblee's proffered reasons for doing so is that Follies does not satisfy the 50 percent food sales threshold to qualify as a restaurant eligible to sell and serve alcohol.[45] However, Chamblee granted an alcohol license to AMF Bowling Center, Inc. (hereafter, Bowlmor) for 2018, even though the face of Bowlmor's application demonstrated that it too failed to satisfy the 50 percent threshold.[46] It is further undisputed that Chamblee renewed Bowlmor's alcohol license for 2019 despite its application again being facially deficient.[47] In December 2019, Chamblee informed Bowlmor that its 2020 application would be denied.[48] After a series of communications between Bowlmor and Chamblee's legal counsel: (1) Bowlmor requested an appeal and hearing on the denial of its alcohol license, which permitted it to continue selling and serving alcohol; (2) the hearing was continued several times; and (3) Chamblee ultimately amended the Alcohol Code

---

[44]   ECF 12-1, ¶ 77.

[45]   *Id*. ¶ 78.

[46]   *Id*. ¶ 84. Follies presents evidence that Bowlmor's total sales of food and non-alcoholic beverages for 2018 only constituted 46 percent of its total revenue [*id*. ¶¶ 82–84].

[47]   *Id*. ¶¶ 86–91.

[48]   *Id*. ¶ 93.

to create a specific carve out for a bowling alley to obtain an alcohol license.[49] Follies alleges Chamblee did not offer it these courtesies or opportunities, which demonstrates the city's selective enforcement of Ordinance 754.

Follies's claim, however, fails at the first step. A showing of a similarly situated comparator "require[s] some specificity." *Campbell*, 434 F.3d at 1314. Although Follies points to evidence that Chamblee treated Bowlmor differently, Follies makes no effort to establish that it and Bowlmor are "*prima facie* identical in all relevant respects." *Grider*, 618 F.3d at 1264. And the Court finds that they are not. Most obviously, Follies is a strip club that offers live nude dancing. Bowlmor is a bowling alley. Follies is categorically prohibited from applying for or obtaining an alcohol license in its capacity as a strip club. This independent restriction is not applicable to Bowlmor. Further, Follies purports to distribute food to its patrons through its practice of pairing crackers or other pre-packaged food with an alcoholic beverage or a free buffet. There is no indication Bowlmor engages in similar activities. At bottom, Follies has failed to put forth evidence showing it and Bowlmor are similarly situated in any respect other than their desire to sell alcohol to customers. Chamblee is entitled to summary judgment.

---

[49] *Id.* ¶¶ 94–108.

### E.    Chamblee's Counterclaims

On February 12, 2020, Chamblee filed its Answer to Follies's Second Amended Complaint and asserted two counterclaims seeking injunctive relief.[50] In counterclaim Count I, Chamblee seeks to enjoin Follies from violating its Alcohol Code by selling alcohol without a license. Similarly, counterclaim Count II requests that the Court stop Follies from violating the Adult Code by continuing to offer fully nude dancing. Neither party has moved for summary judgment on either counterclaim.

Although not expressly invoked by the parties, the Court finds that the exercise of subject matter jurisdiction over Chamblee's state law counterclaims would be inappropriate.[51] When a district court has original jurisdiction over an action, it also has "supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution."

---

[50]    ECF 81.

[51]    The Court possesses the authority to raise the issue of its jurisdiction *sua sponte*. *See Cadet v. Bulger*, 377 F.3d 1173, 1179 (11th Cir. 2004) ("Federal courts are obligated to inquire into subject-matter jurisdiction *sua sponte* whenever it may be lacking."). *See also Ameritox, Ltd. v. Millennium Lab'ys, Inc.*, 803 F.3d 518, 537 (11th Cir. 2015) ("[O]nce a district court possesses discretion to dismiss the supplemental claims, it must be continuously mindful regarding whether or not the factors favor dismissal.").

28 U.S.C. § 1367(a). *See also United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 725, (1966) (holding claims must be so related as to "derive from a common nucleus of operative fact[s]"). But supplemental jurisdiction is a matter ultimately concerning the Court's discretion, not a litigant's right. *L.A. Draper & Son v. Wheelabrator-Frye, Inc.*, 735 F.2d 414, 427 (11th Cir. 1984). For example, a district court "may decline to exercise supplemental jurisdiction over a claim" if it "has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3). *See also Gibbs*, 383 U.S. at 726 ("Certainly, if the federal claims are dismissed before trial . . . the state claims should be dismissed as well."); *L.A. Draper*, 735 F.2d at 428 ("[I]f the federal claims are dismissed prior to trial, *Gibbs* strongly encourages or even requires dismissal of the state claims."). Factors such as "judicial economy, convenience, fairness to the parties, and whether all the claims would be expected to be tried together" remain relevant to the inquiry. *Palmer v. Hosp. Auth. of Randolph Cnty.*, 22 F.3d 1559, 1569 (11th Cir. 1994) (citing *Gibbs*, 383 U.S. at 725–26).

The Court possessed original jurisdiction over Follies's constitutional claims under 28 U.S.C. § 1331. As stated above, Chamblee is entitled to summary judgment on those claims. That leaves only Chamblee's counterclaims, which seek injunctive relief premised solely on state law. These circumstances strongly favor the Court to exercise its discretion and not adjudicate the counterclaims. *See Raney*

*v. Allstate Ins. Co.*, 370 F.3d 1086, 1088–89 (11th Cir. 2004) ("We have encouraged district courts to dismiss any remaining state claims when, as here, the federal claims have been dismissed prior to trial."). It is true that this action has been pending for the better part of three years.[52] But as noted by the Eleventh Circuit, the Court's inquiry "is not just a matter of toting up months or motions or the page counts of judicial orders." *Ameritox*, 803 F.3d at 539. Put another way, time alone does not negate 28 U.S.C. § 1367(c)(3)'s directive or the well-established law of this Circuit. *See id.* ("[E]very litigant who brings supplemental claims in court knowingly risks the dismissal of those claims."). What is more, the parties are litigating substantially similar issues in a parallel state court action.[53] This, too, militates in favor of the Court declining to exercise discretion. *See Ameritox*, 803 F.3d at 540 ("State courts, not federal courts, should be the final arbiters of state law in our federalist system."). Therefore, the Court finds that Chamblee's counterclaims should be dismissed without prejudice.

---

[52] Because Chamblee asserted the counterclaims in its Answer to Follies's Second Amended Complaint, they have only been pending for approximately 18 months.

[53] *See City of Chamblee v. WBY, Inc. d/b/a Follies*, Case No. 19CV10326 (DeKalb Cnty. Ga. Sup. Ct.).

## IV.    CONCLUSION

Follies's motion for partial summary judgment [ECF 118] is **DENIED**; Chamblee's motion for summary judgment [ECF 120] is **GRANTED**; and Follies's motion to strike [ECF 136] is **DENIED**. The Clerk is **DIRECTED** to enter judgment in favor of Chamblee on all of Follies's claims. Further, Chamblee's counterclaims are **DISMISSED WITHOUT PREJUDICE**. The Clerk is **DIRECTED** to close this case.

**SO ORDERED** this the 15th day of July 2021.

Steven D. Grimberg
United States District Court Judge